IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **SHAHID MOHAMAD**, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:10-CV-1189-L-BF** |
| | § | |
| **DALLAS COUNTY COMMUNITY** | § | |
| **COLLEGE DISTRICT,** *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant's Motion for Summary Judgment (Doc. 31), filed January 9, 2012.  On July 23, 2010, this case was referred to United States Magistrate Judge Paul D. Stickney for pretrial management.  The court **vacates** the aforementioned reference, and after careful consideration of the motion, response, reply, briefs, appendices, record, and applicable law, the court **grants** Defendant's Motion for Summary Judgment and **dismisses with prejudice** Plaintiff's claims for discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e, *et seq*.

## I.       Background

Plaintiff Shahid Mohamad ("Mohamad" or "Plaintiff") filed this action *pro se* in the 95th Judicial District Court, Dallas County, Texas, on May 18, 2010, against his former employer Dallas County Community College District ("DCCCD" or the "District") and several former co-workers, alleging violations of Title VII and 42 U.S.C. § 1981, as well as state law claims for breach of contract, negligence, intentional infliction of emotional distress, and intentional interference with

a contractual relationship.  Mohamad's initial pleading sought compensatory damages for lost wages and mental anguish, exemplary damages, and declaratory and injunctive relief.  On June 15, 2010, Defendants timely removed the case to federal court on the basis of federal question jurisdiction. Thereafter, the court granted Defendants' motion for partial dismissal and dismissed with prejudice Plaintiff's section 1981 claim, all of his state law claims, including his claims against the individual Defendants, and his request for exemplary damages.  *See* Doc. 18.  Mohamad's only remaining claims are against the District for unlawful discrimination, retaliation, and disparate impact in violation of Title VII.

Mohamad is a Muslin Arab-American of Palestinian descent, who worked for the District as a campus police officer at Eastfield College from October 2003 until his termination on March 9, 2010.  Pl.'s  Resp. App. 53; Def.'s  App. 13, ¶ 3.  Mohamad contends that he experienced discrimination and harassment during his tenure at Eastfield College because of his race, or national origin and religion.  According to Mohamad, the problems began in February 2007, shortly after Michael Horak ("Horak")was hired as a lieutenant with the Eastfield College police department. Pl.'s App. 67, 77-78; Def.'s App. 18, ¶ 2.  Mohamad contends that in July 2008, Horak insulted him while describing a female student's upcoming class presentation.  Def.'s App. 86-87, 94-96; *see also* Pl.'s App. 26.  Horak attempted to explain to Mohamad and a campus security guard that the student would be wearing a hijab, the head scarf or veil traditionally worn by Muslim women, by stating that she would be wearing "the cover that    the burka that    you know, the what-do-you-call-it."  Def.'s App. 96, 98.  The security guard interjected, "like the Taliban.  Like the Taliban dress up." *Id.* at 96. Horak agreed, telling Mohamad, "[y]ou know, like those terrorists.  *You* would know about it." *Id.*

When Mohamad objected to Horak's comparison of Muslims to terrorists, Horak allegedly refused to apologize, instead telling Mohamad that he was overreacting. *Id*. at 68-71, 96.

Mohamad alleges that the harassment intensified in 2009, after Horak was promoted to the rank of captain and Timothy Ellington ("Ellington") was hired as a lieutenant. Def.'s App. 18, ¶ 2; 21, ¶ 2. Horak allegedly wanted "an all white police department" and furthered his agenda by ordering Ellington to target Mohamad and other minority officers including Lieutenant Ray Hill and Corporal Leo Michael Pleasants, both African-American, and Officer Rodrigo Robles, a Hispanic-American for harassment and termination. Pl.'s App. 5, ¶ 6; Def.'s App. 92. Mohamad contends that Ellington removed him from prestigious assignments, such as firearms instructor and field training officer, transferred his job responsibilities to less-qualified junior officers, and denied him promotions. Def.'s App. 26-27, 80-83; Pl.'s App. 45. Ellington also allegedly relegated Mohamad to menial duties, excluded him from important meetings, threatened to change his work schedule, micromanaged his daily activities, and constantly harassed him about insignificant matters. Def.'s App. 28-36.

In February 2010, Mohamad informed Patricia Rayford ("Rayford"), Director of Human Resources for Eastfield College, that he intended to file a grievance with the Equal Employment Opportunity Commission ("EEOC") regarding his alleged mistreatment by Lieutenant Ellington and other commanding officers in the Eastfield College police department. Def.'s App. 44. Shortly thereafter, Plaintiff filed a formal charge of discrimination with the EEOC and the Texas Workforce Commission Civil Rights Division. Pl.'s Resp. App. 136-38. On February 23, 2010, Mohamad met with Rayford to discuss his complaints. Def.'s App. 42-43; 1, ¶ 3. Rodrigo Robles ("Robles"), another Eastfield College police officer, also attended the meeting. In the course of presenting his

grievance against Ellington, Mohamad told Rayford, "[e]verything is recorded," adding "on paper" or "in writing." *Id*. at 44, 46, 47.  Rayford immediately asked Mohamad if he had notified Ellington that their conversations had been recorded.  *Id.* at 2, ¶ 4.  Robles interjected that recording a conversation is legal as long as one participant in the conversation knows it is being recorded.  *Id.* at 130.  Mohamad never explained what he meant by his statement, and Rayford did not ask for further clarification.  *Id.* at 2, ¶ 4.

After the meeting, Rayford informed Captain Horak, DCCCD Associate Vice Chancellor Luis Camacho ("Camacho"), and Eastfield College President Jean Conway ("Conway") that Mohamad may have violated the District's policy against unauthorized recordings by employees. *Id.* ¶ 5; 6, ¶ 4.  Rayford, Camacho, and Conway decided to terminate Mohamad's employment based on his apparent admission that he recorded conversations with his supervisor without permission in violation of District policy.  *Id.* at 2, ¶ 7; 6, ¶ 5.  On March 9, 2010, Mohamad was summoned to a meeting with Horak, Ellington, Rayford, and Camacho where he was given the option of resigning his position.  *Id.* at 2, ¶ 8.  When Mohamad refused to resign, he was terminated.  *Id.*; *see also id*. at 53-55.

On January 9, 2012, the District moved for summary judgment on Mohamad's remaining claims for unlawful discrimination, retaliation, and disparate impact in violation of Title VII. Mohamad responded to the District's motion on April 19, 2012, and on May 21, 2012, Mohamad filed a response to the District's reply brief to address its objections to the affidavit testimony relied on by Mohamad in response to the District's summary judgment motion.

## II.      Motion for Summary Judgment Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party.  *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original).  "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'"  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586 (citation omitted).  Mere conclusory allegations are not competent summary

judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

## III.    Analysis

While Mohamad's pleadings are less than a model of pellucid draftsmanship, he apparently contends that the District subjected him to disparate treatment on the basis of his race, national origin, and religion in violation of Title VII when it terminated him, denied him promotions, changed his work assignments, and otherwise created a hostile work environment for him. Mohamad further contends that the District retaliated against him in violation of Title VII when it terminated his employment after he filed a charge of discrimination with the EEOC. Mohamad also appears to

argue that the District's disciplinary policies have a disparate impact on minorities.  The District

moves for summary judgment on Plaintiff's claims arising out of his termination on grounds that it

has articulated a legitimate, nondiscrimatory and nonretaliatory reason for its decision and that

Plaintiff cannot establish that its reason is pretextual.  The District also argues that Mohamad's

remaining claims of discrimination are without merit because there is no evidence that the conduct

of which Mohamad complains was motivated by his national origin or religion or was sufficiently

severe or pervasive to constitute a hostile environment.  Finally, the District argues that Mohamad

failed to properly plead and administratively exhaust his hostile work environment claim and that

he has no evidence to support a disparate impact claim.

### A.     *McDonnell Douglas* **Burden-Shifting Framework**

As Mohamad offers only circumstantial evidence of discrimination and retaliation, his

Title VII claims are analyzed using the modified *McDonnell Douglas* burden-shifting paradigm.[1]

*See Jackson v. Watkins*, 619 F.3d 463, 466 (5th Cir. 2010).  To survive a motion for summary

judgment, a plaintiff in a Title VII case must first establish a *prima facie* case of discrimination or

retaliation by a preponderance of the evidence.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

---

[1] In his summary judgment response, Plaintiff appears to argue that he has adduced direct evidence of discrimination, and, thus, the *McDonnell Douglas* analysis does not apply to his claims.  *See* Pl.'s Resp. 15, 19.  Direct evidence is evidence which, if believed, would prove the existence of unlawful discrimination or retaliation without any inferences or presumptions.  *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002), *cert. denied*, 539 U.S. 926 (2003); *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 40-41 (5th Cir. 1996).  Direct evidence includes a "statement or written document showing [the employer's] discriminatory motive on its face[.]" *Vaughn v. Edel*, 918 F.2d 517, 521 (5th Cir. 1990).  Direct evidence does not include, "stray remarks in the workplace," "statements by nondecisionmakers," or "statements by decisionmakers unrelated to the decisional process itself."  *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring).  The only specific evidence Plaintiff identifies in the record as direct evidence is the affidavit of Officer Paul Arroyo that states that Officer Brandon Boney mentioned that "Captain Horak wants an all white department" and that "Captain Horak said the color of the department would change." Pl.'s App. 5.  These statements, however, are not related to any particular adverse employment decision and are stray remarks.  Moreover, no evidence in the record reflects that Horak made the decision to fire Mohamad or that he influenced the decision.  Accordingly, the court determines that it must analyze Mohamad's claims under the well-established burden-shifting framework applicable to claims supported by circumstantial evidence.

**Memorandum Opinion and Order - Page 7**

802-04 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).  Once this *prima facie* case has been established, there is a presumption of discrimination or retaliation, and the burden shifts to the defendant to articulate some legitimate, nondiscriminatory or nonretaliatory reason for the challenged employment action.  *McDonnell Douglas*, 411 U.S. at 802-04.  If such a showing is made, the burden shifts back to the plaintiff to demonstrate that the articulated reason was merely a pretext for intentional discrimination or retaliation.  *Id.*

The third step of the *McDonnell Douglas* test has been altered by the Supreme Court's decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) (holding that in Title VII cases, the mixed-motives theory of discrimination is available in cases with circumstantial evidence of discrimination).  In light of *Desert Palace*, the Fifth Circuit has modified the final step of *McDonnell Douglas*.  *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411 (5th Cir. 2007).  To survive summary judgment under the modified *McDonnell Douglas* test, at the final step, a plaintiff must offer sufficient evidence to create a genuine dispute of material fact that either:  (1) a defendant's reason is not true, but is instead a pretext for discrimination or retaliation, or (2) a defendant's reason, though true, is only one of the reasons for its conduct and that another "motivating factor" is the plaintiff's protected characteristic or activity.  *Id.* at 411-12.

### B.      Objections to Evidence

As a preliminary matter, the District objects to certain summary judgment evidence relied on by Mohamad to raise a genuine dispute regarding material facts in this case, including (1) handwritten statements by Corporal Pleasants regarding events surrounding Pleasants' termination from the Eastfield College police force in November 2010, Pl.'s  App. 8-11, 83; (2) a written statement by Mohamad concerning alleged mistreatment by Captain Horak in October 2009, *id.*

128-31; and (3) the June 30, 2010 decision by the Appeal Tribunal of the Texas Workforce Commission that Mohamad was terminated for reasons other than work-connected misconduct, *id.* 101-05. Under Texas law, findings and conclusions by the Texas Workforce Commission may not be used as evidence in any lawsuits, except for suits brought to enforce unemployment benefits. Tex. Lab. Code Ann. § 213.007. The District's objection to the admissibility of the Texas Workforce Commission's determination is therefore **sustained**. *Williams v. Aviall Servs. Inc.*, 76 F. App'x 534, 536 (5th Cir. 2003), *cert. denied*, 541 U.S. 964 (2004) (prohibiting plaintiff from using Commission determination as evidence to create fact issue in employment discrimination case); *cf. McFadden v. Seagoville State Bank*, No. 3-08-CV-0467-B, 2009 WL 37596, at *3 (N.D. Tex. Jan. 6, 2009) (granting motion to strike Texas Workforce Commission records from summary judgment evidence). Further, as the District correctly notes, the written statements by Pleasants and Mohamad are not sworn. Unsworn written statements are not proper summary judgment evidence. *Okoye v. University of Texas Houston Health Sci. Ctr.*, 245 F.3d 507, 515 (5th Cir. 2001). Accordingly, the District's objections to Mohamad's evidence are sustained, and none of this evidence will be considered by the court in connection with the resolution of the issues presented by the pending motion for summary judgment.

### C.     Discrimination

The court first considers Mohamad's claim that the District subjected him to disparate treatment on the basis of his race, national origin, and religion when it terminated him, denied him promotions, changed his work assignments, and otherwise created a hostile work environment for him.

### 1.      Prima Facie Case

Title VII prohibits discrimination on the basis of "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  To establish a *prima facie* case of discrimination based on disparate treatment, Mohamad must show:  (1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he was the subject of an adverse employment action, and (4) he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances.  *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009).  The fourth prong may also be met if a plaintiff shows that he was replaced by a person who is not a member of the protected class.  *Frank v. Xerox Corp.*, 347 F.3d 130, 137 (5th Cir. 2003).

In the context of establishing a *prima facie* case of discrimination, an adverse employment action means an "ultimate employment decision," such as "hiring, granting leave, discharging, promoting, or compensating."[2]  *McCoy v. City of* Shreveport, 492 F.3d 551, 559 (5th Cir. 2007). Title VII does not cover "every decision made by employers that arguably might have some tangential effect upon those ultimate decisions."  *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003) (quoting *Burger v. Central Apartment Mgmt.*, 168 F.3d 875, 878 (5th Cir. 1999)).  An employment action that "does not affect job duties, compensation, or benefits" is not an adverse employment action.  *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004), *abrogated in part on other grounds by Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53,

---

[2] The Fifth Circuit's precedent recognizing only "ultimate employment decisions" as actionable adverse employment actions in the discrimination context was unaffected by the Supreme Court's ruling in *Burlington Northern & Santa Fe Railway v. White*, 548 U.S. 53, 61-65 (2006), which abrogated the "ultimate employment decision" standard in the *retaliation* context.  Thus, the "ultimate employment decision" standard remains controlling for Title VII discrimination claims.  *McCoy v. City of Shreveport,* 492 F.3d 551, 560 (5th Cir. 2007).

68 (2006).   Major changes in compensation, duties, and responsibilities constitute ultimate employment actions.  *Pegram*, 361 F.3d at 282 n.8 (citing *Hunt v. Rapides Health Care Sys., LLC*, 277 F.3d 757, 770 (5th Cir. 2001)).  Allegations of unpleasant work meetings, verbal reprimands, improper work requests, and unfair treatment do not constitute actionable adverse employment actions.  *King v. Louisiana*, 294 F. App'x 77, 85 (5th Cir. 2008) (citing *Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir. 2000)).

Mohamad contends that he suffered disparate treatment when he was "denied promotions." Pl.'s  Resp. 1.   To present a *prima facie* case of discrimination for denial of a promotion, an employee must show, or raise a genuine dispute of material fact: "(1) that [he] is a member of [a] protected class; (2) that he sought and was qualified for the position; (3) that he was rejected for the position; and (4) that the employer continued to seek or promoted applicants with the plaintiff's qualifications."  *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 317 (5th Cir. 2004) (citing *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 354-55 (5th Cir. 2001)); *see also Haynes v. Pennzoil Co.*, 207 F.3d 296, 300 (5th Cir. 2000).  In this case, Mohamad makes no mention of any promotion he sought and was denied in his EEOC charge or his initial complaint.  His summary judgment response makes only conclusory and nonspecific allegations regarding the denial of promotions to corporal, sergeant, and lieutenant.  Pl.'s  Resp. 4.  The summary judgment evidence similarly contains vague references to "one or more" positions for corporal, sergeant, and lieutenant for which Mohamad applied.  Pl.'s  App. 58, 63.  Thus, there is insufficient evidence to determine that Mohamad sought any particular promotion.

Similarly, there is a lack of evidence showing that Mohamad was qualified for any promotion he allegedly sought.  Mohamad's failure to identify the "specific promotions that he sought" or

adduce evidence that he was qualified for such promotions is fatal to his ability to raise a genuine dispute of material fact as to whether he has established a *prima facie* case of disparate treatment claim based on the denial of a promotion. *See Colbert v. Infinity Broad. Corp.*, 423 F. Supp. 2d 575, 582-83 (N.D. Tex. 2005). Accordingly, the District is entitled to judgment as a matter of law on Mohamad's disparate treatment claims to the extent they are based on the denial of promotions.

Mohamad also contends that he suffered disparate treatment when Ellington and Horak "reduced [] his assignments to special units." Pl.'s Resp. 1. In particular, Mohamad alleges that he was removed from various special assignments, including Field Training Officer, firearms training, Criminal Investigation Division, and Special Tactical Response Team. Pl.'s App. 59; Def.'s App. 26-27. Mohamad, however, does not allege, much less adduce evidence, that he suffered a reduction in title, salary, or benefits as a result of the loss of any special assignment. Thus, even if Mohamad's allegations regarding his removal from various special assignments are true, such removal does not constitute an actionable adverse employment action under Title VII. *Williams v. United States Dep't of Navy*, 149 F. App'x 264, 269 (5th Cir. 2005) (citing *Hernandez v. Crawford Bldg. Material Co.*, 321 F.3d 528, 531 (5th Cir. 2003)).

To the extent Mohamad suggests that he was discriminated against when Ellington or Horak threatened to change his days off, Pl.'s App. 39; Def.'s App. 28; assigned him to undesirable duties, Def.'s App. 30-31; or excluded him from certain meetings, *see id.* 36, the court determines that such conduct also falls short of the "ultimate employment decision" standard. *Watts v. Kroger Co.*, 170 F.3d 505, 511 (5th Cir.1999) (concluding that changes in employee's work schedule and work assignments are not adverse employment decisions); *Jeffery v. Dallas Cnty. Med. Exam'r*, 37 F. Supp. 2d 525, 527 (N.D. Tex. 1999) (same); *Matthews v. City of Houston Fire Dep't*, 609 F. Supp.

2d 631, 645 (S.D. Tex. 2009) (concluding that assignment of undesirable duties or exclusion of employees from certain meetings not considered "ultimate employment decisions").  The court therefore determines that Mohamad has failed to raise a genuine dispute of material fact as to whether he suffered an actionable employment action under Title VII.  The District is therefore entitled to judgment as a matter of law on Mohamad's disparate treatment claims to the extent they are based on his work assignments.

"[I]t is beyond dispute that a termination constitutes an adverse action." *Pegram*, 361 F.3d at 283.  The District does not challenge Mohamad's ability to establish a *prima facie* case of disparate treatment based on his termination.  Instead, the District argues that it terminated Mohamad because it had concluded that Mohamad had admitted to Rayford that he violated DCCCD policy by recording conversations with Ellington, and Mohamad cannot establish that this reason is a pretext for discrimination.  Assuming, without deciding, that Mohamad has established a *prima facie* case of disparate treatment with regard to his termination, the court analyzes whether the District has shown a legitimate, nondiscriminatory reason for its decision to terminate Mohamad's employment.

### 2.       Legitimate, Nondiscriminatory Reason

The District presented evidence, including the affidavit of Associate Vice Chancellor Camacho, that DCCCD policy generally prohibits employees from making secret recordings of conversations with other employees and that an employee's violation of the policy could result in his or her termination. Def.'s App. 5-6, ¶ 3.  Specifically, the policy provides:

> No employee may record, by any means, a conversation of an employee or student unless all the following criteria are met:

1.      A legitimate purpose for the recording.

2.      A recording device in plain view.

3.      Written authorization from the supervisor of the employee who wishes to record the conversation.

Secret recordings are strictly prohibited unless authorized in writing by College District legal counsel.

*A violation of this provision may result in disciplinary action, including termination.*

Def.'s  App. 12 (emphasis added).

The District also presented evidence that Rayford heard Mohamad admit, or apparently admit, that he violated DCCCD's policy prohibiting the recording of conversations.  According to Rayford's affidavit, Mohamad made the statement, in the course of presenting his grievance at the February 23, 2010 meeting, that "he recorded all his conversations with Lt. Ellington."  Def.'s  App. 2, ¶ 4.  When Rayford inquired whether Mohamad notified Ellington that he was recording their conversations, Robles interrupted and stated that as long as one person in the conversation knows that it is being recorded, it is legal.  *Id*.  Mohamad continued presenting his grievance without further comment about recording conversations.  *Id*.  Mohamad's own deposition testimony is that he told Rayford, "[e]verything is recorded on paper" or "in writing."  *Id.* at 44, 47.  Mohamad contends that Rayford simply misunderstood his statement to mean that he made audio recordings of his conversations with Ellington.  *Id.* at 47.  He concedes, however, that Robles responded to Rayford's question with the comment that a recording would be legal if one person knew about it.  *Id.* 45. Mohamad also admits that he never corrected Rayford's alleged misunderstanding and did not clarify what he meant by his statement.  *Id*. at 48-49.

**Memorandum Opinion and Order - Page 14**

Camacho stated in his affidavit that Rayford advised him of a potential violation of DCCCD policy by Mohamad involving surreptitious recordings, *Id.* at 6, ¶ 4, and "[after an investigation, Ms. Rayford, College President Dr. Jean Conway, and I decided that Officer Mohamad should be offered the opportunity to resign in lieu of termination but that, if Officer Mohamad did not resign, then his employment would be terminated for violation" of DCCD's policy prohibiting recording of conversations. *Id.* ¶ 5. According to Camacho, "Mohamad was given the option of resigning his position due to the policy violation. When [he] chose not to resign, he was terminated." *Id.*

The court determines that the District has articulated a legitimate, nonretaliatory reason for terminating Mohamad's employment. Specifically, the District has provided evidence that it terminated Mohamad because he recorded conversations with Ellington, which the District believed to be in violation of its policy. The District's burden is only one of production, not persuasion, and the court finds that the District has met its burden at this step.

### 3.     Pretext or Motivating Factor

Since the District has set forth a legitimate, nondiscriminatory reason for terminating Mohamad's employment, the burden shifts back to Mohamad, who must either show that: (1) the District's proffered reason is a pretext for discrimination, or (2) the District's reason, although true, is only one of the reasons for its conduct and that another "motivating factor" is Mohamad's protected characteristic. *Burrell*, 482 F.3d at 411-12.

In an attempt to show that Defendant's reason is pretextual, Mohamad denies that he secretly recorded conversations with Ellington and denies that he made an admissions in this regard. According to Mohamad, he simply told Rayford, "[e]verything is recorded *on paper*." Def.'s App. 44 (emphasis added). Mohamad does not dispute, however, that Rayford understood his statement

regarding "recordings" as an admission that he had made audio recordings of Ellington; nor does he dispute that Rayford reported her understanding of Mohamad's statements to Camacho and Conway, who determined that Mohamad had violated DCCCD' policy against surreptituous recordings. Def.'s App. 47; 2, ¶¶ 5, 7.  Thus, the District's decision to terminate Mohamad's employment was based on its determination, whether right or wrong, that Mohamad had admitted to violating DCCCD policy.  *Id.* ¶ 7.

A plaintiff's self-serving denial of allegations of misconduct fails to create an issue of fact as to pretext.  *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010).  In investigating an employee's alleged policy violations, "[t]he question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive."  *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995); *LeMaire v. Louisiana Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007) ("Our job as a reviewing court conducting a pretext analysis is not to engage in second-guessing of an employer's business decisions.").  Here, even if the court determined that the District reached an erroneous conclusion regarding Mohamad's conduct, he has adduced nothing to show that discriminatory animus motivated the decision to terminate his employment.

Further, Mohamad's belief that he had a constitutionally-protected right to make secret recordings of his supervisors does not raise a genuine dispute of material fact as to pretext.  The court initially observes that Mohamad cites no authority for the proposition that he has a right to make such recordings.  To the contrary, numerous courts have upheld the termination of employees for making or attempting to make secret recordings in violation of a company policy.  *See, e.g., Jones*

*v. St. Jude Med. S.C., Inc.*, 823 F. Supp. 2d 699, 743-44 (S.D. Ohio 2011) (concluding that the plaintiff failed to demonstrate pretext where she admitted making tape recordings without consent in violation of an express company policy); *Moray v. Novartis*, No. 3-07-CV-1223, 2009 WL 82471, at *11-12 (M.D. Tenn. Jan. 9, 2009); *Shoaf v. Kimberly-Clark Corp.,* 294 F. Supp. 2d 746, 757 (M.D. N.C. 2003) (finding that employee's admission that he violated company policy prohibiting secret recordings was a legitimate, nonretaliatory reason for discharge); *Peterson v. West*, 122 F. Supp. 2d 649, 659 (W.D. N.C. 2000) (finding a legitimate and nondiscriminatory reason for employee's discharge after employee attempted to surreptitiously tape-record a meeting with his direct supervisor); *Ingram v. Pre-Paid Legal Servs., Inc*., 4 F. Supp. 2d 1303, 1307 (E.D. Okla. 1998) (acknowledging that a legitimate and nondiscriminatory reason for employee's discharge existed based on the employee's surreptitiously tape recording conversations with his superiors in violation of employment policy prohibiting such conduct); *Hashop v. Rockwell Space Operations Co.*, 867 F. Supp. 1287, 1300 (S.D. Tex. 1994) (concluding that employee's violation of policy against secretly tape-recording conversations constituted justifiable grounds for termination). To the extent Mohamad attempts to rely on the decision of the Texas Workforce Commission Appeal Tribunal to establish that the District failed to meet its burden of showing that Mohamad actually made secret recordings, the court determines that this evidence is inadmissible under section 213.007 of the Texas Labor Code for the reasons already explained. The court therefore declines to consider it.

Next, Mohamad points to alleged examples of disparate treatment to show pretext. He contends that four other nonminority officers violated DCCCD policies, including policies pertaining

to "records," but were not terminated.  Pl.'s  Resp. 25-26.  According to Mohamad, Officer Byron Langley ("Langley") falsified his Daily Activity Reports, carried an unauthorized weapon, and engaged in inappropriate conduct with female companions while on duty.  *Id.* 7-8; Pl.'s App. 12-14, 77-79.  Corporal Brandon Boney ("Boney") allegedly performed an unauthorized traffic stop using his personal vehicle, which was equipped with red and blue flashing lights, and used excessive force against a detainee.  Pl.'s  Resp. 8, 18; Pl.'s  App. 80-82.  Officer Donna Thompson ("Thompson") allegedly was involved in a traffic accident in a DCCCD vehicle and failed to properly report the accident in accordance with District policy. Pl.'s Resp. 21; Pl.'s App. 80.  Finally, Mohamad asserts that Horak advised the mother of an arrestee that she could not file a complaint against Boney because she was not the person arrested. Pl.'s  Resp. 17; Pl.'s  App. 83.

An employee who proffers a fellow employee as a comparator in an employment discrimination case must demonstrate that the employment actions at issue were taken under nearly identical circumstances.  *Lee*, 574 F.3d at 260. "The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories."  *Id.* "[C]ritically, the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions."  *Id.*

Here, Mohamad has proffered no evidence indicating that Langley, Boney, Thompson, or Horak violated the DCCCD policy prohibiting secret recordings of employee conversations or made

statements that could be interpreted as an admission of a violation of that policy.  Additionally, there is no evidence that Corporal Boney or Captain Horak had the same job or responsibilities as Mohamad, who was not promoted beyond the rank of officer.  Thus, Mohamad has not shown that these employees were treated differently under circumstances nearly identical to his.

Mohamad also attempts to demonstrate pretext by offering evidence that other minority officers who violated DCCCD policies were also terminated.  Specifically, Mohamad identifies Hill and Pleasants, both African-American, and Robles, a Hispanic-American, as having been terminated after violating different DCCCD policies.  Pl.'s Resp. 23-24.  None of these four officers is Arab-American or Muslim.  Consequently, any evidence pertaining to their terminations does not raise a genuine dispute of material fact that Mohamad was discriminated against on basis of his race, national origin, or religion.

Finally, Mohamad argues that Horak and Ellington "possessed discriminatory animus" against him based on his race, national origin, and religion and that, because of their relationship with Rayford and other DCCCD administrators, they influenced the decision to terminate him.  Pl.'s Resp. 38.  This argument, however, is wholly speculative and is not supported by any evidence that would enable a reasonable jury to find that Horak or Ellington had any involvement in the decision to terminate his employment.  *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002) ("[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate" to raise a genuine dispute of material fact.) (quoting *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996)).  Accordingly, the court concludes that Mohamad has not adduced any competent summary judgment  evidence to allow a reasonable jury to find that the District's

proffered reason for terminating him is unworthy of credence or otherwise pretextual.  The court therefore concludes that Mohamad has failed to raise a genuine dispute of material fact regarding pretext, and the District is entitled to judgment as a matter of law on Mohamad's claims of disparate treatment.

### D.    Hostile Work Environment

The court next considers Mohamad's claim that he was harassed and subjected to a hostile work environment on the basis of his race, national origin, and religion.[3]  Ordinarily, to establish a *prima facie* case of harassment alleging hostile work environment, an employee must raise a genuine dispute of material fact or prove: (1) that he belongs to a protected class; (2) he was subject to unwelcome harassment; (3) the harassment complained of was based on his protected characteristic; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action.  *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002).  In *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), the Supreme Court modified this test with respect to cases in which the alleged harasser is a supervisor with immediate or higher authority over the harassed employee.  *Celestine*, 266 F.3d at 353-54 (citation omitted).  In such cases, the employee need only meet the first four elements of the test.  *See id.*

The fourth element of the test is met only if the harassment was "sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment."

---

[3]  The District also argues that Mohamad failed to properly plead and administratively exhaust his hostile work environment claim.  Def.'s 8-9, 15-16.  Because the court determines Mohamad's claim otherwise fails on the merits, it does not address these arguments.

*Id.; Ramsey*, 286 F.3d at 268.  If the conduct at issue was not severe or pervasive, the employer cannot be held vicariously liable for the supervisor's actions.  *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 409 (5th Cir. 2002).  To be actionable, the work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  *Hernandez*, 641 F.3d at 125 (citing *Faragher*, 524 U.S. at 787). To determine whether an environment was objectively offensive, courts consider the totality of the circumstances, including the frequency of the conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance.  *EEOC v. WC & M Enters., Inc.*, 496 F.3d 393, 399 (5th Cir. 2007); *Hernandez*, 641 F.3d at 125.  "Workplace conduct is not measured in isolation." *Ramsey*, 286 F.3d at 268 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001)).  For a hostile working environment to be deemed sufficiently hostile, all of the circumstances must be taken into consideration.  *Id.*

Even when a hostile environment is shown, the plaintiff must establish that the workplace environment had the effect of altering the terms, conditions, or privileges of his employment.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 403 (5th Cir. 1993). Not all harassment will affect a term, condition, or privilege of employment.  The "mere utterance of an . . . epithet [that] engenders offensive feelings in a[n] employee[ ] does not sufficiently affect the conditions of employment."  *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999) (citation omitted).  Title VII's overall goal of equality is not served if

a claim can be maintained solely based on conduct that wounds or offends but does not hinder an employee's performance. *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996).

Mohamad's hostile work environment claim is based on conduct that began in 2007, after Horak joined the Eastfield College police department, and escalated in 2009, when Ellington was hired as a lieutenant in the department. Specifically, Mohamad complains that Ellington removed him from prestigious assignments, relegated him to menial duties, micromanaged his daily activities, and constantly made him feel worthless. Def.'s App. 26-36. Mohamad, however, fails to point to any evidence to show that this treatment was because of his race, national origin, or religion. Mohamad concedes that he never heard Ellington make any negative or derogatory comments about Muslims or people of Arabic descent. Def.'s App. 88, 89. Further, Mohamad asserts that Ellington micromanaged *all* of the officers under his command, not only Mohamad or other minorities. Def.'s App. 60-62. Thus, Mohamad has not shown that Ellington's conduct was manifestly, or even inferentially, based on one of his protected characteristics. The court therefore determines that Mohamad has failed adduce evidence to raise a genuine dispute of material fact as to whether Ellington's conduct created a hostile work environment on the basis of his race, national origin, and religion in violation of Title VII.

Mohamad also asserts that Horak harassed him by making offensive comments about Arabs and Muslims and interfered with his work performance by undermining his authority with suspects, prohibiting him from making arrests, removing him from special assignments, and threatening to change his work schedule. Pl.'s Resp. 38. Only one of these alleged instances of harassment is clearly related to Mohamad's race, national origin, and religion. In July 2008, Horak made

statements to Mohamad and a campus security officer that implied Muslims were terrorists.  *See* Def.'s  App. 86-87, 94-98.  Horak described a student wearing a hijab as being dressed "like those terrorists," *see id.* 96, and implied that Mohamad would be familiar with terrorists and the Taliban because he was an Arab-American and a Muslim.  *See id.*  Although the District concedes that Horak's statements were offensive and racially-tinged, it disputes that the harassment was sufficiently severe or pervasive enough to constitute a hostile work environment.  The court also concludes that these comments were directed towards Mohamad's religion and national origin.

Viewing the evidence as a whole, the court concludes that the harassment experienced by Mohamad did not rise to a level to constitute a hostile work environment.  Specifically, the evidence fails to show that the conditions of Mohamad's employment were objectively offensive with respect to his race, national origin, or religion.  Although the statement by Horak certainly qualifies as offensive, it was not repeated with any frequency and was not physically threatening.  The conduct experienced by Mohamad did not even closely approximate the conduct experienced by  employees in other cases where the court has determined that the evidence raised a genuine dispute of material fact as to the employees' hostile work environment claims.

For example, in *WC & M Enterprises*, *Incorporated*, 496 F.3d at 399, the plaintiff, Mohommed Rafiq, was called "Taliban" by coworkers multiple times per day, even after repeated requests for his coworkers to stop.  *Id.* at 396.  Rafiq's manager also called him "Taliban" on four or five occasions.  *Id.*  Rafiq was also often referred to as "Arab," even though Rafiq told his coworkers on numerous occasions that he was from India.  *Id.* at 397.  Rafiq's coworkers mocked his religious dietary restrictions and prayer rituals.  *Id.*

The Fifth Circuit determined that the evidence showed Rafiq was subjected to verbal harassment on a regular basis for a period of approximately one year. *Id.* at 400. The court also concluded that "Rafiq was sporadically subjected to additional incidents of harassment, such as his co-workers' comments on September 11, 2001, which suggested that he was somehow involved in the terrorist attacks against the United States; [a coworker's] statement that Rafiq should 'just go back where [he] came from;' and [a supervisor's] October 16, 2002 written warning, which stated that Rafiq was acting like a 'Muslim extremist.'" *Id.*

The court noted that a regular pattern of frequent verbal ridicule or insults sustained over time can constitute severe or pervasive harassment sufficient to violate Title VII. *Id.* at 400. The court nevertheless concludes here that the conduct experienced by Mohamad was infrequent in comparison. Mohamad has not shown a regular pattern of frequent verbal ridicule or insults sustained over time. *Compare Celestine,* 266 F.3d at 354 (concluding that eight incidents of alleged racial harassment involving supervisory personnel over a two-year period was insufficient to constitute a hostile work environment); *Carter*, No. 3-10-CV-1486-L, 2011 WL 6090700, at *29-31 (N.D. Tex. Dec. 6, 2011) (reaching same conclusion in case involving six racial incidents or statements over an eighteen-month period, including the display of a noose). The court therefore determines that Mohamad has not established that the harassment was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment. Accordingly, he has failed to raise a genuine dispute of material fact as to this issue, and the District is entitled to judgment as a matter of law on Mohamad's hostile work environment claim.

### E.      Retaliation

The court next considers Mohamad's claim that he was terminated in violation of Title VII in retaliation for filing a charge of discrimination with the EEOC.  It is "an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice" under Title VII, or "because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.  42 U.S.C. § 2000e-3(a); *see also Breeden*, 532 U.S. at 269. Whether the employee opposes an unlawful practice or participates in a proceeding against the employer's activity, the employee must hold a reasonable belief that the conduct he opposed violated Title VII.  *Long v. Eastfield Coll.*, 88 F.3d 300, 305 (5th Cir. 1996).

To establish a *prima facie* case of retaliation in this circuit, a plaintiff must show that: (1) he engaged in a protected activity; (2) he experienced an adverse employment action following the protected activity; and (3) a causal link existed between the protected activity and the adverse employment action.  *McCoy*, 492 F.3d at 556-57 (footnote and citation omitted);  *Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001)*; Mota v. University of Texas Houston Health Sci. Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001).  The establishment of a *prima facie* case gives rise to an inference of retaliation.  *Montemayor,* 276 F.3d at 692.  This inference, in turn, shifts the burden of proof to the defendant, who must then articulate a legitimate, nondiscriminatory or nonretaliatory reason for the challenged employment action.  *McCoy*, 492 F.3d at 557.  Once a defendant asserts such a reason, the inference of discrimination or retaliation raised by the *prima facie* showing drops from the case.  *Montemayor,* 276 F.3d at 692.  At this point, summary judgment is appropriate unless

the plaintiff can prove that the defendant's rationale is pretextual. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-03 (1973).

In *Burlington Northern & Santa Fe Ry. Co. v. White*, the Supreme Court held that, because the discrimination and retaliation provisions of Title VII have different statutory language and different purposes, "the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." 548 U.S. at 64. Consistent with this view, the court held that a plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory action "materially adverse" in that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotation marks and citation omitted). In so ruling, the court rejected Fifth Circuit authority, *id.* at 67, which defined adverse employment actions as "ultimate employment decisions" and limited actionable retaliatory conduct to acts "such as hiring, granting leave, discharging, promoting, and compensating." *Id.* at 61 (quoting *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997)). In evaluating whether actions are materially adverse, the court went on to hold that "petty slights, minor annoyances, and simple lack of good manners will not" deter or dissuade a reasonable employee from making or supporting a charge of discrimination, and therefore they do not constitute conduct that is "materially adverse." *Id.* at 68.

In *Smith v. Xerox Corporation*, the Fifth Circuit held that in retaliation cases, as in other Title VII cases, the plaintiff is not required to present direct evidence of retaliation in order to obtain a mixed-motive jury instruction. Instead, a plaintiff may argue a mixed-motive theory using either direct or circumstantial evidence. *Smith,* 602 F.3d 320, 322 (5th Cir. 2010). "However, where no

evidence of the kind required for a mixed-motive theory is present, the case proceeds under a 'pretext' analysis, where the 'burden returns to the plaintiff to prove that the protected conduct was a 'but for' cause of the adverse employment decision." *Plumlee v. City of Kennedale*, 795 F. Supp. 2d 556, 563 (N.D. Tex. 27, 2011) (citing *Hernandez v. Yellow Transp., Inc.*, 641 F.3d 118, 129 (5th Cir. 2011) (requiring "but for" causation under a pretext alternative).

Under a pretext alternative, a plaintiff may avoid summary judgment on "but for" causation by demonstrating a conflict in substantial evidence on this ultimate issue. *Hernandez*, 641 F.3d at 132. Evidence is "substantial" if it is of such quality and weight that reasonable and fair-minded [persons] in the exercise of impartial judgment might reach different conclusions. *Id*. "After the employer has produced evidence to rebut the employee' prima facie case of retaliation, the showing that the plaintiff must make to establish causation is more onerous than that initially required to present a prima facie case." *Arrieta v. Yellow Transp., Inc.*, 2008 WL 5220569, at *17 (N.D. Tex. Dec.12, 2008), *aff'd*, 641 F.3d at 128 (citing *Phillips v. Credit Lyonnais*, 2002 WL 1575412, at *8 n.4 (N.D. Tex. July 16, 2002); *Long*, 88 F.3d at 305 n.4. "[T]iming can sometimes be a relevant factor in determining whether a causal connection exists where the timing between a protected activity and an adverse employment action is 'suspicious[ly]' proximate." *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 418 n.9 (5th Cir. 2003) (citing *Shackelford v. DeLoitte & Touche, LLP,* 190 F.3d 398, 409 (5th Cir. 1999)). Evidence of temporal proximity between the protected act and the adverse employment action alone, however, is insufficient to create a genuine dispute of material fact regarding "but for" causation. *Strong v. University Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir.2007).

The District's motion focuses on its argument that it has articulated a legitimate, nondiscriminatory or nonretaliatory reason for Mohamad's termination. Specifically, the District asserts that Mohamad was terminated based on the District's belief that he admitted to violating DCCCD policy by recording conversations with Ellington. The District argues that Mohamad cannot raise a genuine dispute of material fact to show that the District's articulated reason is a pretext for retaliation. Because the District not address Mohamad's ability to establish a *prima facie* case of retaliation, the court assumes for purposes of deciding the District's motion that Mohamad has established a *prima facie* case of retaliation with regard to his termination. In addition, the court determines that the District has met its burden to articulate a legitimate, nonretaliatory reason for its decision to terminate Mohamad's employment.

Despite his discussion of the mixed-motive alternative, Mohamad argues only pretext in response to the District's motion for summary judgment on his retaliation claim. Accordingly, the court will not consider the mixed-motive alternative but instead considers whether Mohamad has met his burden of establishing "but for" causation under a pretext alternative. In this regard, Mohamad points to following evidence, contending that the District's articulated reason for firing him is false: (1) Camacho was aware that Mohamad and others had previously complained or expressed the opinion (to Camacho) that Ellington was not qualified for the position he held; and (2) Horak had a "rapport" with Rayford as a result of "the Corporal Pleasants Referral to Professor Michael Santiaga."[4]  Mohamad also argues with out any reference to evidence: "At the meeting on March 9, 2010, Luis Camacho's first words could and quite probably should have been 'Ms. Rayford

---

[4] For support, Mohamad cites to "App. at pg. 9 (Line #63-Line #67)" but because no appendix page was provided, the court was unable to locate the evidence referred to in Plaintiff's 143-page appendix.

believe you violated District policy by audibly recording conversations. Is that true?'"[5]   In addition,

Mohamad contends that there is no evidence that the District investigated the grievance he made to

Rayford on February 23, 2010, before he was terminated on March 9, 2010.   Finally, Mohamad

argues:

> [his] grievance progressed rapidly from the filing of a Complaint with the Commission on February 19th, to filing a grievance with Eastfield on February 23rd, to termination on March 9, 2010 before the committee of Patricia Rayford; Luis Camacho; Captain Michael Horak; and Lt. Timothy Ellington. At the minimum, Patricia Rayford, Luis Camacho, and Jean Conway spent the time between February 23 and March 9, 2010 processing Officer Mohamad's termination. Based on the relationship of all parties described throughout, Officer Mohamad argues that Captain Horak and Lt. Ellington were consulted and had influence over the decision to terminate Officer Mohamad and the veracity of which is a matter for the factfinder. . . . Officer Mohamad avers that President Jean Conway's decision to terminate Plaintiff was influenced by Captain Horak and Luis Camacho, at the minimum.

Pl.'s Resp. 42.   For support that the District's stated reason for firing him is a pretext, Mohamad cites

*In Staub v. Proctor Hospital*, 131 S.Ct. 1186, 1190 (2011), for the proposition that "it is common

for injuries to have multiple causes (extending the cat's paw discrimination claim such that an

employer may be held liable for the discriminatory acts of an employee's supervisor who did not

actually make the challenged employment decision if the supervisor's discrimination influenced the

ultimate decisionmaker."   Pl.'s Resp. 42-43 (quoting *Staub*).

Staub involved a claim of a member of the United States Army Reserves against his employer

Proctor for violations of the Uniformed Services Employment and Reemployment Rights Act of

1994 ("USERRA").   Staub, who was employed as an angiography technician, claimed that his

immediate supervisor (Mulally) and Mulally's supervisor (Korenchuk) were hostile to his military

---

[5] Pl.'s Resp. 42.

obligations. Before being fired, Mulally gave Staub a "Corrective Action" disciplinary warning that required him to inform his supervisor when he left his desk and report to Mulally or Korenchuk when he completed cases. *Id*. at 1189. Three months later, Korenchuk reported that Staub had violated the Corrective Action by leaving his desk without informing his supervisor.

After reviewing Korenchuk's report, Proctor's vice president of human resources (Buck) reviewed Staub's personnel file and decided to fire him. Staub filed a grievance, claiming that Mulally had fabricated the allegation underlying the warning out of hostility toward his military obligations. Buck nevertheless adhered to her decision, and Staub sued Proctor under USERRA, which forbids an employer to deny "employment, reemployment, retention in employment, promotion, or any benefit of employment" based on a person's "membership" in or "obligation to perform service in a uniformed service," and provides that liability is established "if the person's membership . . . is a motivating factor in the employer's action." *Id.* at 1190-91 (quoting 38 U.S.C. §§ 4311(a), (c). Staub sought to hold his employer liable on the grounds that Mulally and Korenchuk were motivated by hostility to his military obligations and that their actions influenced Buck's (Proctor's agent) decision. *Id.* at 1191.

After a jury found in favor of Staub, the district court denied Proctor's motion for judgment as a matter of law. The Seventh Circuit reversed, holding that the Proctor was entitled to judgment as a matter of law. *Id.* at 1191. On appeal, the Supreme Court reversed and remanded, holding that "if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." *Id.* at 1194 (footnote omitted).

In its opinion, the court discussed the Seventh Circuit reasoning and its application of Seventh Circuit case law regarding "cat's paw" claims and the significance of an employer's investigation:

> The [Seventh Circuit] observed that Staub had brought a " 'cat's paw' case," meaning that he sought to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision. It explained that under Seventh Circuit precedent, a "cat's paw" case could not succeed unless the nondecisionmaker exercised such "'singular influence'" over the decisionmaker that the decision to terminate was the product of "blind reliance." It then noted that "Buck looked beyond what Mulally and Korenchuk said," relying in part on her conversation with Day and her review of Staub's personnel file.  The court "admit[ted] that Buck's investigation could have been more robust," since it "failed to pursue Staub's theory that Mulally fabricated the write-up." But the court said that the "'singular influence'" rule "does not require the decisionmaker to be a paragon of independence": "It is enough that the decisionmaker is not wholly dependent on a single source of information and conducts her own investigation into the facts relevant to the decision." Because the undisputed evidence established that Buck was not wholly dependent on the advice of Korenchuk and Mulally, the court held that Proctor was entitled to judgment.

*Id.* at 1190 (quoting *Staub v. Proctor Hosp.*, 560 F.3d 647,  659 (7th Cir. 2009), *reversed and remanded by* 130 S.Ct. 2089 (2011)).  In construing the phrase "motivating factor in the employer's action," contained in section 4311(c) of USERRA, the Supreme Court noted in dicta that "the statute is very similar to Title VII, which prohibits employment discrimination 'because of . . . race, color, religion, sex, or national origin' and states that such discrimination is established when one of those factors 'was a motivating factor for any employment practice, even though other factors also motivated the practice.'" *Id.* at 1191 (quoting 42 U.S.C. §§ 2000e 2(a), (m)).  Other than this single reference to Title VII in the court's opinion, there was no other discussion by the court regarding Title VII.

In support of its holding, the Supreme Court applied traditional tort law principles of proximate cause and declined to hold that an employer is required under USERRA to conduct an independent investigation and further noted with regard to an employer's investigation:

> [I]f the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action (by the terms of USERRA it is the employer's burden to establish that), then the employer will not be liable. But the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified. We are aware of no principle in tort or agency law under which an employer's mere conduct of an independent investigation has a claim-preclusive effect. Nor do we think the independent investigation somehow relieves the employer of "fault." The employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision.
>
> Justice ALITO claims that our failure to adopt a rule immunizing an employer who performs an independent investigation reflects a "stray[ing] from the statutory text." We do not understand this accusation. Since a supervisor is an agent of the employer, when he causes an adverse employment action the employer causes it; and when discrimination is a motivating factor in his doing so, it is a "motivating factor in the employer's action," precisely as the text requires. Justice ALITO suggests that the employer should be held liable only when it "should be regarded as having delegated part of the decisionmaking power" to the biased supervisor. But if the independent investigation relies on facts provided by the biased supervisor — as is necessary in any case of cat's-paw liability — then the employer (either directly or through the ultimate decisionmaker) will have effectively delegated the factfinding portion of the investigation to the biased supervisor. Contrary to Justice ALITO's suggestion, the biased supervisor is not analogous to a witness at a bench trial. The mere witness is not an actor in the events that are the subject of the trial. The biased supervisor and the ultimate decisionmaker, however, acted as agents of the entity that the plaintiff seeks to hold liable; each of them possessed supervisory authority delegated by their employer and exercised it in the interest of their employer. In sum, we do not see how "fidelity to the statutory text," requires the adoption of an independent-investigation defense that appears nowhere in the text.

*Id*. at 1193-94.

As noted by the Supreme Court, there are some similarities between USERRA and Title VII. The Court's reasoning in Staub, however, does not help Mohamad.  Mohamad argues, based on lack of evidence to the contrary, that the District failed to investigate his grievance or confirm whether he actually violated DCCCD policy before firing him.  Title VII does not require an employer to conduct an investigation, and there is no evidence that the District had a policy or failed to follow a policy requiring an investigation or steps that must be taken prior to the termination of an employee.  Moreover, the "[f]ailure to follow internal procedures is generally not enough to create a genuine issue of fact as to discriminatory motives."  *Grubb v. Southwest Airlines*, 296 F. App'x 383, 390 (5th Cir. 2008); *Moore v. Eli Lilly & Co.*, 990 F.2d 812, 819 (5th Cir. 1993).

With regard to Mohamad's remaining evidence and arguments, the court concludes that any "rapport" or collegial relationship Rayford may have had with Camacho, Horak, and Ellington is not sufficient to establish pretext where, as here, there is no evidence Horak and Ellington had any input regarding the District's decision to fire Mohamad; nor is there evidence that Horak or Ellington had authority to fire Mohamad. Their mere presence at the meeting in which Mohamad was asked to resign for violating District policy is not evidence that they were decisionmakers, and Mohamad points to no evidence that either Horak or Ellington were aware that he had filed an EEOC complaint and internal grievance with the District. Horak and Ellington may have been asked to attend the March 9, 2010 meeting simply because they were Mohamad's supervisors; however, the court will not speculate.

Similarly, there is no evidence that Horak or Ellington was aware of Mohamad's opinion as expressed to Camacho regarding their lack of qualifications for the positions they held.  Even if they

were aware, Mohamad's expression of his opinion in this regard is not protected conduct and thus cannot support a claim for retaliation.  Mohamad's contention that Camacho's first words at the meeting pertained to his alleged policy violation supports the District's argument that it terminated his employment for violation of its policy against recorded conversations.  Moreover, even assuming that Mohamad can survive the prima facie stage, the temporal proximity of his EEOC Complaint and his termination, standing alone, is insufficient at the pretext stage.  *See Strong*, 482 F.3d at 808. Accordingly, the court concludes that Mohamad has failed to present substantial evidence sufficient to meet his burden of establishing that the District would not have fired him but for his protected conduct in filing an EEOC complaint. Mohamad has therefore failed to raise a genuine dispute of material fact as to  whether the District's stated reason for his termination was pretextual, and the District is entitled to judgment as a matter of law on his retaliation claim.

### F.      Disparate Impact

Finally, the court considers Mohamad's claim that the District's disciplinary policies have a disparate impact on minority officers.  A disparate impact claim arises when an employer's otherwise neutral policy has a "significantly disproportionate impact" on a protected class. 42 U.S.C. § 2000e-2(k)(1)(A)(i); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975). To establish a *prima facie* case of disparate impact, a plaintiff must (1) identify the challenged employment practice or policy; (2) demonstrate a disparate impact on a group that falls within the protective ambit of Title VII; and (3) demonstrate a causal relationship between the identified practice and the disparate impact.  *Gonzales v. City of New Braunfels*, 176 F.3d 834, 839 n.26 (5th Cir. 1999).  Disparate impact claims do not require proof of intent to discriminate.  *Munoz v. Orr*, 200 F.3d 291, 299 (5th

Cir.), *cert. denied*, 531 U.S. 812 (2000).  Instead, they focus on facially neutral employment practices that create such statistical disparities disadvantaging members of a protected group that they are "functionally equivalent to intentional discrimination." *Id.* (quoting *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 987 (1988)).  The evidence in a disparate impact case must focus on the degree of statistical disparity between protected and nonprotected workers, and the burden is on the plaintiff to conduct a systemic analysis of those employment practices and present evidence in order to establish his case.

Mohamad presents no evidence that the District's disciplinary process causes a significantly discriminatory impact on minority officers.  To the contrary, the District offers uncontroverted evidence that there was no significant change in the number of minority officers at Eastfield College during Mohamad's tenure there.  Def.'s App. 14-15, ¶ 4.  To the extent Mohamad's argument is that the District only subjects minority officers to the disciplinary process at Eastfield College,  Pl.'s Resp. 44, his claim is actually one of disparate treatment rather than disparate impact.  *See Caswell v. Federal Express Corp.*, No. 3-00-CV-1757-L, 2002 WL 31927116, at *11 (N.D. Tex. Dec. 31, 2002) (In the absence of statistical evidence of disparate impact, the court interpreted the plaintiff's claim that minority officers were singled out and terminated because of their race as a disparate treatment claim.).  For the reasons stated above, the court concludes that Mohamad's disparate treatment claim has no merit, and he has failed to raise a genuine dispute of material fact as to this claim.  The District is therefore entitled to judgment as a matter of law on Mohamad's disparate impact claim.

## IV.     Plaintiff's Request to Amend

Mohamad maintains that he has pled a cause of action for mixed-motive discrimination by the District, but to the extend the court determines otherwise, he seeks leave to amend his Complaint based on his contention that "the [District's] proffered legitimate, nondiscriminatory and non-retaliatory reasons for discharging [him] are pre-textual in light of the successive and 'coinciding' terminations of minority and protected status police officers within a 22-month [sic] and preclude summary judgment." Pl.'s Resp. 47-48. It appears that Mohamad misunderstands his burden at this stage as the summary judgment respondent. In deciding the District's summary judgment motion, the issue is not whether Mohamad has pled a mixed-motive case of discrimination but whether he, as the summary judgment respondent, has come forward with direct or circumstantial evidence to support a mixed-motive alternative to pretext in response to the District's legitimate, nondiscriminatory and nonretaliatory reason for terminating his employment. Moreover, as this case has been pending more than two years, any amendment at this late stage of the proceedings would unnecessarily and unjustifiably delay the resolution of the case. Pleadings should be amended well before a dispositive motion deadline, which was September 9, 2011. This was eight months after Mohamad obtained counsel. Mohamad has not shown good cause to amend and to delay further the resolution of this case. Moreover, Mohamad's true request is not only to replead his case but also to reopen the evidence to provide evidence in support of his mixed-motive theory. Once again, he has not shown good cause for the court to allow him to supplement the record. Mohamad's request to amend is therefore **denied.**

**V.     Objections to Evidence**

The court has only considered evidence that is admissible pursuant to Rule 56 of the Federal Rules of Civil Procedure and the summary judgment standard herein enunciated.  Accordingly, to the extent the court has not explicitly addressed the parties' arguments regarding objections to evidence, the objections are moot and **overruled**.

**VI.    Conclusion**

For the reasons stated herein, the court **determines** that no genuine dispute of material fact exists regarding Plaintiff's claims for unlawful discrimination, retaliation, and disparate impact in violation of Title VII.  Accordingly, the court **grants** Defendant's Motion for Summary Judgment and **dismisses with prejudice** Plaintiff's claims.  Judgment will issue by separate document as required by Federal Rule of Civil Procedure 58.

**It is so ordered** this 28th day of September, 2012.

Sam A. Lindsay
United States District Judge